**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 10:23 AM November 27, 2013**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| JOE MARTIN AND BETTY JO MARTIN, | ) | CASE NO. 10-64790 |
| | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION (NOT** |
| | ) | **INTENDED FOR PUBLICATION)** |
| | ) | |

  Toby L. Rosen, the chapter 13 trustee ("Trustee"), filed a modification to increase Joe Martin and Betty Jo Martin's (collectively, "Debtors") monthly chapter 13 plan payments from $250.00 to $1,512.00, based on Trustee's calculation of Debtors' increase in monthly income and reductions in Debtors' allegedly excessive monthly expenses. Debtors oppose Trustee's modification and submit their own modification, which would increase Debtors' monthly plan payments to $336.04. The court held hearings on the modifications on July 10, 2013 and September 25, 2013. During the September hearing, the court ordered Trustee and Debtors to submit briefs in support of their positions. Both parties have submitted the required documents, and the modification of Debtors' chapter 13 plan is now before the court. Therefore, the issue is whether Debtors' monthly chapter 13 plan payments should be modified under 11 U.S.C. § 1329, and if so, what Debtors' new monthly plan payments should be.

  The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on April 4, 2012. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This modification is a core proceeding under 28 U.S.C.

1

§ 157(b)(2)(L),[1] which relates to the "confirmations of plans," especially because "[m]odification of a plan is essentially a new confirmation." Ledford v. Brown (In re Brown), 219 B.R. 191, 195 (B.A.P. 6th Cir. 2012).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## Facts

Debtors commenced a joint chapter 13 bankruptcy case on November 12, 2010. At the time of the petition, Debtors were a married couple with a seventeen year-old daughter. According to Debtors' original bankruptcy schedules ("Original Schedules"), Mr. Martin was a heavy machinery operator at Oxford Resources GP, LLC with gross earnings of approximately $47,190.00 per year. After subtracting taxes and other payroll deductions, Mr. Martin's take-home pay was $3,216.93 per month. Also according to the Original Schedules, Mrs. Martin worked in human resources at Imco Recycling of Ohio, Inc. earning approximately $34,040.00 annually. After removing taxes and other payroll deductions, Mrs. Martin's take home pay was $2,241.44 per month. Based on the above, when Debtors filed their bankruptcy petition, their annual gross income was approximately $81,230.00, resulting in $5,458.37 in monthly take home pay. Debtors' schedule J in their Original Schedules lists total monthly expenses of $5,032.37, leaving a monthly surplus of $426.00.

The court confirmed Debtors' chapter 13 plan on September 8, 2011, which stated that Debtors will make monthly plan payments of $426.00 for sixty months, resulting in unsecured creditors receiving 20% on their claims. On the same day, Debtors and Trustee entered into an agreed order increasing Debtors' monthly plan payments to $535.00.

Sometime before November of 2012, Debtors were involved in an automobile accident which destroyed one of their vehicles. In order to obtain a new vehicle, Debtors submitted a motion to obtain new debt, which the court approved on November 14, 2012. On December 11, 2012, in order for Debtors to make their new car payments and maintain their standard of living, Debtors' monthly plan payments were reduced from $535.00 to $250.00. Immediately before the drafting of the current opinion, Debtors' monthly plan payments remained at $250.00.

The next year, on July 9, 2013, Debtors' amended schedules I and J ("July Schedules"), showing an increase in monthly net income by approximately $370.00, up to $5,830.07, and a corresponding increase in monthly expenses by approximately $200.00, up to $5,230.07. The main changes in expenses were monthly reductions in: (1) cellular telephone by $52.00; (2) cable television and internet by $50.00; and (3) home maintenance by $50.00, but the reductions were offset by monthly increases of $396.00 for payments on the new vehicle and $100 for medical and dental expenses. Trustee's arguments in favor of modification are based on the July Schedules.

---

[1] Additionally, an action to modify a chapter 13 plan under 11 U.S.C. § 1329 is also the type of case that "arises under" the bankruptcy code and is therefore core under Sixth Circuit precedent. See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1144 (6th Cir. 1991).

2

In preparing Trustee's current modification proposal, she investigated Debtors' current financial circumstances and discovered evidence illustrating that Debtors' income from employment has increased substantially. Trustee bases her finding on Debtors' year-to-date income amounts from Debtors' June pay stubs. Trustee also believes Debtors' prior year tax refund of $1,811.00 should be factored into Debtors' future monthly plan payments. Trustee similarly evaluated each of Debtors' expenses, finding that the expenses in the following categories are excessive and should be reduced: (1) cable internet and television; (2) cellular and home telephone; (3) transportation; and (4) charitable contributions. After combining all of Trustee's proposed modifications, she seeks an increase in Debtors' monthly plan payments from $250.00 to $1,512.00. Trustee filed a brief in support of her position on October, 21 2013.

In support of their proposed plan modification, Debtors filed their own brief, also on October 21, 2013. Debtors' brief included new schedules I and J ("October Schedules"), which made significant changes to Debtors' July Schedules. The October Schedules decreased Debtors' monthly take-home pay $22.88, from $5,830.07 to $5,807.19, while also increasing Debtor's monthly expenses $241.08, from $5,230.07 to $5,471.15. The October Schedule J makes a number of significant changes, but none larger than a $500.00 monthly increase in medical expenses.

This court notes that Debtors' modification is based on the October Schedules, while Trustee's modification is based on the July Schedules. However, the court's scheduling order filed on October 2, 2013 states that if either party desires to submit a reply to their opponent's legal brief, that reply will only be permitted with leave of the court. Trustee has not asked for leave to respond to Debtors' October Schedules. Based on Trustee's decision not to respond, the court moves forward with this opinion. A comparison showing the changes in monthly expenses between the July Schedule J and the October Schedule J is set out below.

|  | July Schedule J | October Schedule J | Change |
|---|---|---|---|
| Electricity and Heating Fuel | 390.00 | 310.00 | (80.00) |
| Water and Sewer | 125.00 | 50.00 | (75.00) |
| Home Telephone[2] | 85.37 | 35.00 | (50.37) |
| Cellular Telephone | 133.00 | 215.00 | 82.00 |
| Cable Television and Internet | 110.00 | 123.79 | 13.79 |
| Trash | 45.00 | 20.00 | (25.00) |
| Medical and Dental | 600.00 | 1,100.00 | 500.00 |
| Transportation | 520.00 | 645.00 | 125.00 |
| Charitable Contributions | 400.00 | 150.00 | (250.00) |
|  |  |  |  |
| Total |  |  | 240.42[3] |

---

[2] The July Schedule J and October Schedule J categorize their expenses differently. The July Schedule J uses the same breakdown shown in the above table, while the October Schedule J combines cellular phone, internet, and home phone service into one line item. Based on text from Debtors' brief, the court was able to reclassify the October Schedule J into the same expense breakdown as the July Schedule J.

[3] The paragraph immediately above the table shows a total change between the July Schedule J and October Schedule J of $241.08, which differs by $0.66 from the amount shown in the table. The difference is related to one immaterial line item that was left off the table.

3

## Law and Analysis

Once a chapter 13 plan has been confirmed, modifications of that plan must occur under 11 U.S.C. § 1329. In re Hill, 386 B.R. 670, 673 (Bankr. S.D. Ohio 2008). The parts of § 1329 relevant to the current dispute state that:

> a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to--
> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan; . . .
> (b)(1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.

Based on the sections incorporated by reference in § 1329(b)(1), a modification must be proposed in good faith and be feasible, as well as a number of other requirements (such as the "best interest of creditors test"). 11 U.S.C. § 1325(a)(3), (4), (6).

The first additional requirement made applicable by § 1329(b)(1) that is relevant to this case is that all chapter 13 modifications must be proposed in good faith. 11 § U.S.C. §§ 1329(b)(1), 1325(a)(3); In re Walpole, 2010 WL 2696847, at *1–2 (Bankr. N.D. Ohio 2010). Within the Sixth Circuit, good faith under § 1325(a)(3) does not focus on one item, but instead "requires consideration of the totality of the circumstances." Soc'y Nat'l Bank v. Barrett (In re Barrett), 964 F.2d 588, 591 (6th Cir. 1992). Some of the factors a court should evaluate when making a good faith determination are the debtor's income, the debtor's living expenses, special circumstances (such as unusually high medical expenses), the amount of plan payment as indicative of the debtor's sincerity, and "the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the debtor." In re Brinkley, 2013 WL 5935157, at *6 (Bankr. E.D. Mich. 2013) (holding that a debtor's retention of a piece of Florida real estate that was rented to the debtor's son for less than debtor's cost to retain the property was bad faith).

Another § 1329(b)(1) requirement is that a chapter 13 plan modification must be feasible. 11 U.S.C. § 1325(a)(6). This requires that a debtor "be able to make all payments under the plan and to comply with the plan." Id. If, after evaluating the debtor's plan, the court determines that a debtor has a "clear inability" to make the required plan payments, then the court must deny modification. 8 Collier on Bankruptcy, ¶ 1325.07[1] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013). "While the feasibility requirement is not rigorous, the plan proponent must, at a minimum, demonstrate that [d]ebtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan." In re Morris, 2012 WL 2341537, at *9 (Bankr. S.D. Cal. 2012). A lack of feasibility has lead a number of courts to consistently deny the confirmation of plans with "speculative contingencies." In re Huffman, 2012 WL 9503368, at *4 (Bankr. S.D. Ohio 2012) (determining that a chapter 13 plan proposing the sale of real property in an unreasonable timeframe was not feasible); In re Hogue, 78 B.R. 867, 873 (Bankr. S.D. Ohio

4

1987) (holding that debtor's "bare assertions that they will sell or refinance their residence at or near the end of their Chapter 13 plans . . . does not satisfy the feasibility requirement"); In re Cushman, 263 B.R. 293, 294–95 (Bankr. W.D. Mo. 2001) (holding that a debtor cannot fund a chapter 13 plan with expected gambling winning because "gambling, regardless of the ability of the gambler, is inherently too uncertain a source of income to fund a Chapter 13 plan.").

One issue courts within the Sixth Circuit have wrestled with, and sometimes reached different conclusions on, is whether the "means test" of § 1325(b) is applicable in chapter 13 modifications. See In re Grissom, 137 B.R. 689, 691 (Bankr. W.D. Tenn. 1992) (noting that it is "not at all clear" whether § 1325(b) applies in a chapter 13 modification). The more recent view, and the view with which this court agrees, is that § 1325(b) does not apply in chapter 13 modifications. In re Hill, 386 B.R. at 677 (holding that because § 1329 references § 1325(a), but not (b), § 1325(b) is not applicable in modification proceedings); In re Crim, 445 B.R. 868, 871 (Bankr. M.D. Tenn. 2011) ("By its terms, however, § 1329 does not incorporate § 1325(b) of the Bankruptcy Code."); see also Sunahara v. Burchard (In re Sunahara), 326 B.R. 768, 781 (B.A.P. 9th Cir. 2005) ("Section 1329(b) expressly applies certain specific Code sections to plan modifications but does *not* apply § 1325(b). Period."). Because § 1325(b) does not apply, a plan modification is not required to satisfy the "projected disposable income" test of § 1325(b). In re Crim, 445 B.R. at 871. Therefore, a debtor's income and expenses are not calculated under the formulaic approach set out in § 1325(b), but instead are based on the debtor's actual income and expenses at the time of the proposed modification. Id. In summary, "[t]he only limits on modification are those set forth in the language of the Code itself, coupled with the bankruptcy judge's discretion and good judgment in reviewing the motion to modify." In re Hill, 386 B.R. at 674–75.

Some courts place an additional hurdle in front of a trustee attempting to modify a debtor's plan. Based on the common law doctrine of res judicata, these courts hold that an unanticipated and substantial change in the debtor's income or expenses must occur before § 1329 can modify a previously confirmed chapter 13 plan. See In re Murphy, 474 F.3d 143, 149 (4th Cir. 2007). However, the Sixth Circuit Bankruptcy Appellate Panel rejected this view and determined that the plain wording of § 1329 "does not contain a requirement for unanticipated or substantial change as a prerequisite to modification." In re Brown, 219 B.R. at 195. Therefore, this court finds that an unanticipated or substantial change is not required before a plan modification may be granted.

The argument between Trustee and Debtors revolves around the amount Debtors' monthly plan payments should be. Trustee and Debtors first disagree on Debtors' monthly net income. Trustee alleges that Debtors' net income is $6,314.07 per month, while Debtors claim only $5,807.19. The parties also dispute how to treat Debtors' prior year income tax refund. Finally, Trustee argues that Debtors' average monthly expenses are excessive and specifically objects to Debtors' allowances for home telephone service, cellular telephone service, cable television, high speed internet, transportation, and charitable contributions. The court will analyze Debtors' income and expenses below.

5

## I. Proposed Income Modifications

This court will first analyze Debtors' and Trustee's arguments surrounding Debtors' monthly income. As discussed above, this court notes that the rigid "projected disposable income" calculation referenced in § 1325(b), which mandates that income be calculated under the formula for "current monthly income," a statutorily defined term requiring "the average monthly income from all sources that the debtor receives . . . during the 6-month period" starting with the month immediately before the filing of bankruptcy, does not apply in a § 1329 modification. 11 U.S.C. § 101(10A). If this court was required to use the statutory definition of "current monthly income," a debtor's income at the time of modification would be the exact same as their income at the time of filing the bankruptcy petition, even if significant changes occurred in the debtor's life. Both courts and a leading treatise have called such a result "nonsensical," as doing so would require courts to use income amounts that may differ significantly from the debtor's actual income at the date of modification. 8 Collier on Bankruptcy, ¶ 1329.03; see also In re Hill, 386 B.R. at 677; In re Ireland, 366 B.R. 27, 30–32 (Bankr. W.D. Ark. 2007).

Trustee and Debtors disagree on Debtors' income. Debtors' July Schedule I lists monthly net income of $5,830.07, while Debtors' October Schedule I lists monthly net income at $5,807.19, resulting in a relatively inconsequential difference. In Trustee's brief in support of her proposed modification, she argues that Debtors' combined monthly net income is $6,163.00 (before accounting for any tax return amounts), based on Debtors' year-to-date pay information contained in their June pay stubs. In response to Trustee's net income figure, Debtors provide their own calculation which averages individual pay stubs starting in late September of 2013, but dates back to April of 2013 for Mr. Martin and June of 2013 for Mrs. Martin. However, Debtors do not provide an explanation for choosing the approximately five month and three month look back period for calculating Mr. and Mrs. Martin's income. Additionally, certain pay periods within the look back period for Mr. Martin are excluded without explanation. With the above explained deficiencies, Debtors calculate Mr. Martin's weekly net income at $811.71, which corresponds with monthly net income of $3,517.33. Also based on Debtors' calculations, Mrs. Martin, who is paid semi-monthly, receives an average net payment of $1,164.73 per pay period, which Debtors calculate as net income of $2,289.86 per month. Mrs. Martin's net income includes bankruptcy plan payments made directly by her employer.

Debtors and Trustee both put forward methods of calculating monthly net income that is supported by documentary evidence. According to Trustee, Debtors' combined monthly net income is $6,163.00, while Debtors calculate $5,807.19. The court must conduct its own calculation. The most recent paystub the court has for Mr. Martin is September 22, 2013, which lists his year-to-date net income as $34.928.39. His September 22, 2013 pay stub covers thirty-eight weeks, meaning his average weekly net income is $919.17. As there are an average of 4.33 weeks in each month, Mr. Martin's average monthly net income is $3,980.00. Mrs. Martin's year-to-date earnings on her end of September paystub, which is the most recent paystub the court has in its possession, lists year to date net income of $18,971.82 along with $2,677.50 in payments directly from her employer for bankruptcy plan payments, for a total net income of $21,649.32. The year-to-date figure covers exactly nine months, meaning Mrs. Martin's average

6

monthly net income is $2,405.48. Combined, the court calculates Debtors' average monthly net income to be $6,385.48.

After calculating Debtors' average monthly net income, the tax refund issue remains. In 2013, Debtors received federal and state tax refunds in the amount of $1,606.00 and $205.00, respectively, resulting in a total refund of $1,811.00 for 2012 income tax returns. When the tax refund is prorated over the course of the year, Debtors' income increases by approximately $151.00 per month. Trustee argues that the prorated tax refund amount should be added to Debtors' average monthly income for the purpose of determining future plan payments. Debtors' brief does not address the issue.

Debtors' 2012 tax refund is property of the estate. The court's order confirming the chapter 13 plan notes that "[a]ll property of the estate . . . that is acquired subsequent to the filing of the petition does not vest to the debtor(s) and remains property of the estate unless Court ordered." Order Confirming Chapter 13 Plan 1, EFC Doc. 46; see also In re Grissom, 137 B.R. at 690 (holding that the wording of the bankruptcy code makes it "clear that a debtor's post-confirmation tax refund is property of the estate"). However, simply because the tax refund becomes property of the estate does not automatically mean that the tax refund should be put towards plan payments. In re Grissom, 137 B.R. at 690.

A tax refund is a one-time payment from the government to an individual based on the amount of taxes that individual overpaid during the previous tax year. The exact amount of a refund is often difficult to calculate, even harder to predict, and a Debtor may owe the government additional taxes at year end instead of receiving a refund. Under the facts of this case, the court finds that it would not be feasible, as required for modification by 11 U.S.C. § 1325(a)(6), to require Debtors to pay an increased monthly payment based on an expected tax refund that would not be received, if at all, until the beginning of the next tax year. The tax refund is a type of "speculative contingency" bankruptcy courts have consistently rejected when confirming or modifying chapter 13 plans. See In re Huffman, 2012 WL 9503368, at *4. Additionally, Trustee's proposed additional payment of $151.00 per month would significantly strain the Debtors' ability to make plan payments. For example, in the case of In re Hall, 442 B.R. 754, 763 (Bankr. D. Idaho 2010), the debtors received a large lump-sum payment, portions of which they spent improperly. The trustee in the case asked for the funds to be returned via increased monthly plan payments, but the court found the plan "unworkable and, frankly, naïve," because the debtors had already spent the funds and had no feasible way to repay the money. See also In re Morris, 2012 WL 2341537, at *9 (deciding that monthly plan payments based on average annual income were not feasible when the debtor received a significant portion of his income as contingent bonuses and stock awards at year end). Similar to the two cases cited above, Debtors' future tax refunds are speculative amounts received at year end, and the prior year's tax refund has already been spent. This court finds that it is not feasible, as required under § 1329(a)(6), for Debtors to make additional plan payments based on the amount of their prior year tax refund.

However, this court finds that any future tax refunds received during the plan should be paid to the Trustee. In the current case, because the tax refunds are property of the bankruptcy estate, and no evidence was presented to show that Debtors' future tax refunds are needed to

7

provide for themselves or their dependents, the court finds that any future tax refunds are income that should be paid to the Trustee. See In re Barbutes, 436 B.R. 518, 529 (Bankr. M.D. Tenn. 2010). This result is strengthened by the nature of a tax refund. A tax refund represents an overpayment of taxes. If an individual's taxes are properly paid each month, instead of being overpaid (resulting in a year-end tax refund), the difference between the properly paid amount and the overpayment amount is additional monthly income. If this monthly income is not required by the debtor's monthly budget, the income would be paid to the trustee. Therefore, based on the facts of the current case, any future tax refund received by Debtors should be paid to Trustee.

In conclusion, Debtors' monthly combined net income is $6,385.48. While this court declines to require Debtors to pay their 2012 tax refund via increased monthly plan payments, future tax refunds received during the chapter 13 plan shall be paid to Trustee.

## II.     Proposed Expense Modifications

The court now turns to an analysis of Debtors' expenses. Under a chapter 13 plan, a debtor is not expected to live in poverty, but also may not preserve a life of comfort at the expense of their creditors. In re Srikantia, 417 B.R. 505, 509–10 (Bankr. N.D. Ohio 2009); In re Jones, 114 B.R. 917, 926 (Bankr. N.D. Ohio 1990). The bankruptcy code "envisions some sacrifice on the debtor's part in granting him relief." In re Srikantia, 417 B.R. at 509–10; In re Scarberry, 428 B.R. 403, 408 (Bankr. N.D. Ohio 2009) (holding that a debtor may "be required to engage in some good, old-fashioned belt tightening"); In re Mooney, 313 B.R. 709, 716 (Bankr. N.D. Ohio 2004) ("There is nothing wrong with a nice home, multiple premium cell phone services, high speed internet access, zoo memberships, wine magazine subscriptions, dog treats, dog dental care items and more. There is something wrong when these expenses continue and unpaid creditors are told by the bankruptcy court to shinny up a cactus."). The court reiterates that expenses proposed by Trustee and Debtors must comply with § 1329(b).

The court "is under a duty to scrutinize debtor's expenses, and make downward adjustments where necessary, so as to ensure the debtor's expenses are reasonable." In re Felske, 385 B.R. 649, 655 (Bankr. N.D. Ohio 2008); see also 11 U.S.C. § 1325(a)(3); In re Srikantia, 417 B.R. at 509–10. It is important to note that for the purposes of a modification under § 1329, a debtor's expenses are not calculated under the method provided by § 1325(b), but instead are based on the debtor's actual expenses at the time of modification. In re Crim, 445 B.R. at 871. When determining what a debtor's reasonable monthly expenses are, the court's own knowledge and experience are important, but the IRS expense standards ("IRS Standards")[4], which are referenced in the bankruptcy code "means test" of § 707(b)(2)(A)(ii)(I), give the court an objective point of reference. In re McDonald, 437 B.R. 278, 291 n.14 (Bankr. S.D. Ohio 2010) ("[T]he IRS expense guidelines . . . provide a basis to evaluate the objective good faith of a chapter 13 plan other than through the court's own personal experiences and knowledge."). While the IRS Standards may help the court determine an appropriate amount for a specific

---

[4] Census Bureau, IRS Data and Administrative Expense Multipliers, U.S. Department of Just. (Nov. 4, 2013), http://www.justice.gov/ust/eo/bapcpa/meanstesting.htm. Some of the IRS Standards, such as "Food Clothing & Other Items" are uniform throughout the country, while others, such as "Housing and Utilities and Transportation" change based on the debtor's county of residence.

8

expense category, in a § 1329 modification the IRS Standards are not binding and instead are only a starting point from which the court makes its own independent judgment. See 11 U.S.C. § 1329; In re McDonald, 437 B.R. at 291 n.14.

This court will use the IRS Standards as of the date of modification, not the original petition date, when evaluating Debtors' expenses. Because § 1329 relates to "any time after confirmation of the plan," applying the standards as of the modification date, and not the original petition date, more closely mirrors the language of the statute. See 11 U.S.C. § 1329(a). Additionally, if a court is to consider Debtors' actual current income and expenses in a § 1329 modification, using the IRS standards as of the modification date provides a more accurate objective starting point. See In re Crim, 445 B.R. at 871.

### A. Home Mortgage and Utilities

The first expense category is Debtors' monthly home mortgage and utility expenses. The IRS Standard for a family of three located within Tuscarawas county, Ohio, is $502.00 for non-mortgage related items, and $837.00 for rent or mortgage expense, for a combined amount of $1,339.00. According to the IRS Standards, the total of these two amounts should cover monthly expenses for mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, cell phone, internet, and cable. Debtors' combined expenses for these categories from the October Schedules total $1,744.54, which is $405.54 over the IRS Standard.

Regarding Debtors' mortgage expense, the IRS standards allow $837.00 for monthly mortgage or rent expense for a family of three. Debtors' monthly rent or mortgage expense from the October Schedule J is $840.75. Trustee does not challenge Debtors' mortgage expense, and likewise, this court finds such an expense to be reasonable based on the IRS schedules and the court's knowledge of real estate within Tuscarawas county.

Debtors' utility expenses, however, do not fall so cleanly within the IRS Standards. Debtors' utility expenses, which consists of electricity, gas, water, sewer, home repairs, high-speed internet, cable television, home telephone, and cellular telephone services totals $903.79 per month. The IRS Standards for the same expenses are $502.00 per month, putting Debtors $401.79 above the IRS Standards. In order to facilitate further analysis, this court will split Debtors' expenses into two separate categories, one for electricity, gas, water, sewer, and home repairs (collectively, "Home Utilities"), and the other for cable television, internet, and telephone service (collectively, "Communication Utilities").

The court will first evaluate the reasonableness of Debtors' Home Utilities expenses of $530.00 per month. The bankruptcy "means test," while not directly applicable in a chapter 13 modification, allows the inclusion of utility expenses in excess of the IRS Standards based "on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are reasonable and necessary." 11 U.S.C. § 707(b)(2)(A)(ii)(V). Because the means test is an inflexible calculation of disposable income, especially when compared to a court's discretion in a § 1329 modification, this court finds it relevant that the means test allows for increased expenses based on actual utility expenses.

9

Therefore, in a modification under § 1329 this court will allow the actual costs necessary to provide basic heating, cooling, water and trash removal services to a debtor's home, as long as those expenses are reasonable and well documented, even if the amounts exceed the IRS Standards.

To support Debtors' Home Utilities expenses, Debtors provide their monthly electricity expenses for the prior three years (from August 2010 to August 2013). Starting with August of 2013, and including the previous 12 months, Debtors' average electricity expense is $255.33 per month.[5] Debtors also provide documentary support of their purchase history for propane, which Debtors use to heat their home. While the exact amount of propane consumed within the past twelve months cannot be exactly determined from the information provided, approximately 425 gallons of propane were used between November of 2012 and August of 2013. The total price for the 425 gallons of propane was $801.99, which averages approximately $67.00 per month over the course of a year. Debtors' October Schedule J claims electricity and heating costs of $310.00 per month, which is very close to the court's estimate of approximately $322.00 per month. Debtors' October Schedule J also includes monthly expenses of $50.00 for water and sewer, $20 for trash, and $150.00 for home maintenance.[6] The court finds Debtors' water, sewer, and home maintenance costs to be reasonable. Therefore, while Debtors' monthly expenses for Home Utilities are high, Debtors have provided documentary evidence of the expenses, and the court finds that Debtors' Home Utility expenses are reasonable, necessary, and proposed in good faith.

Debtors' Communications Utilities total $373.79 per month. Trustee has objected to Debtors' Communications Utilities expenses, but has agreed to allow Debtors to maintain a monthly expense of $250.00 within this category. As mentioned above, when all of Debtors' Home and Communication Utilities are combined, Debtors total utility expenses are $903.79, which is $401.79 over the IRS Standard. While being over the IRS Standards does not automatically result in the court reducing Debtors' expenses in the category, the IRS Standards do present this court with an objective starting point. See In re Crim, 445 B.R. at 871. First, the court notes that Debtors' television and internet expense is $123.79 per month. While not incredibly high, such a monthly expense suggests more than basic cable and does not illustrate the "belt-tightening" bankruptcy requires. See In re Scarberry, 428 B.R. 403, 408 (Bankr. N.D. Ohio 2009). Next, Debtors' monthly cell phone bill of approximately $215.00 per month is excessive.[7] For example, in In re Gilmore, 2010 WL 2342441, at *5 (Bankr. N.D. Ohio 2010), the court determined that a $150 per month cell phone bill was objectionable because "the bankruptcy code demands that the debtors make reasonable sacrifices," and under the specific facts of that case, cutting the cell phone budget was reasonable because "the record does not suggest a special need for cell phones and the debtors have a working ground [telephone] line." The same is true in the current case. Additionally, in In re Scarberry, 428 B.R. at 408, the court decided that debtors generally should not be able to purchase more than basic phone service,

---

[5] The Debtors' electricity bills show very large variance in electricity expense based on the season, with bills in the summer months often over $400, with corresponding winter bills often below $200. Such fluctuations appear reasonable based on Debtors' use of propane, and not electricity, to heat their home.

[6] In support of the home repair monthly expense amount, Debtors provide receipts for a water pump that needed to be replaced (a total cost of $386.40) as well as the purchase of a new stove (a total cost of $808.35).

[7] In stark contrast to the detail provided by Debtors to support their income and Home Utility expenses, Debtors provide no evidence to support their Communication Utility expenses.

10

deciding that cellular service for texting, mobile internet, and nonessential calls essentially results in unsecured creditors subsidizing Debtors' unnecessary luxuries. Based on the above, the court finds Trustee's offer of $250.00 per month for Communications Utilities to be a reasonable middle-ground. Therefore, this court will allow Debtors a monthly expense amount of $250.00 for Communications Utilities.

### B. Transportation Expenses

Debtors claim transportation expenses of $645.00 per month, which is in excess of the IRS Standard of $424.00 per month for a family with two vehicles. Debtors explain that their high transportation expenses result from their daily commutes to work (approximately seventy-four miles round-trip for Mr. Martin and six miles round-trip for Mrs. Martin) as well as seventy mile round-trip outings three to four times a week for doctor visits in Canton, Ohio. Debtors' transportation expenses also include costs associated with vehicle maintenance and repairs. Trustee argues that the amounts over the IRS Standards should be disallowed.

Some courts have been hesitant to allow monthly transportation expenses greater than the IRS Standards. For example, in In re Tranmer, 355 B.R. 234, 250–51 (Bankr. D. Mont. 2006), the court refused to allow transportation expenses above the IRS Standards based on the debtor's long commute from their home to work. The court reached the conclusion because the debtors "failed to show why they could not reduce or eliminate their commutes by relocating their residence." Id. at 251. Important to the court's analysis was that the debtors would be able to significantly reduce their combined work-related mileage by changing their place of residence. Id. The court however, never suggested that the debtors obtain new employment in locations that would shorten their commute. See id. Additionally, in In re McClellan, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009), the court refused to allow a pair of debtors to take $700.00 per month in transportation expenses because "neither of the [d]ebtors are required, as a part of their employment, to frequently travel."

In the current case, Debtors' place of residence in Uhrichsville, Ohio, is reasonably close to being centrally located to the Debtors' places of employment, as well as their doctor in Canton, Ohio. The Debtors could not significantly reduce their transportation expenses by changing their place of residence. Additionally, in In re Tranmer, the court was analyzing the facts through the lens of a chapter 13 plan confirmation, which requires a court to comply with the "means test." Modification under § 1329 does not reference the "means test," giving bankruptcy courts additional discretion in allowing or disallowing certain expenses. Except in rare circumstances, a debtor should not be forced to change their place of residence in order to reduce their transportation expenses associated with employment and doctor's visits in order to be within the IRS Standards. While this court does not decide what such a rare circumstance might be, a combined daily husband and wife work commute of eighty-two miles, combined with between 210 and 280 weekly miles for doctor visits, is not such a rare circumstance. The court allows Debtors' transportation expenses of $645.00 per month.

### C. Medical Expenses

Debtors' July Schedule J lists medical expenses of $600.00 per month, but the October Schedule J increases medical expenses by $500.00, up to $1,100.00 per month. Either amount is well over the IRS Standards, which allows out-of-pocket monthly medical expenses of $60.00 for a person under sixty-five and $144.00 for a person sixty-five or older. The out-of-pocket amounts are in addition to any amounts that may be spent on health insurance. In support of their medical expenses, Debtors provide their 2012 income tax return, which shows annual medical expenses of $13,185.00, or approximately $1,100.00 per month. Trustee's brief did not challenge Debtors' $600 per month medical expenses figure, nor did she file a motion with this court after Debtors filed their October Schedules changing their monthly medical expenses to $1,100.00. When evaluating medical expenses, courts have consistently allowed monthly medical expenses greater than the IRS Standards if the debtors can provide documentary evidence of those expenses. In re Kaminski, 387 B.R. 190, 197–98 (Bankr. N.D. Ohio 2008) (allowing medical expenses above the amount normally allowed by the means test because the debtors provided supporting evidence); In re Crim, 445 B.R. at 870 (allowing modification of a chapter 13 plan based on increased medical expenses); In re Riddle, 410 B.R. 460 (N.D. Tex. 2009) (allowing a downward modification in chapter 13 plan payments due to increased medical expenses associated with the debtor's daughter's asthma); In re Sellers, 409 B.R. 820, 830 (Bankr. W.D. La. 2009) (finding that an increase in medical expenses from $250 per month to $400 per month supported a chapter 13 modification); In re Hall, 442 B.R. at 762 & n.5 (allowing modification of a chapter 13 plan based on a $740.00 monthly increase in medical expenses); In re Perkins, 304 B.R. 477, 480, 488 (Bankr. N.D. Ala. 2004) (allowing modification of a chapter 13 plan due to increased medical expenses that decreased the percentage paid to unsecured creditors from 100% to 0%). The court allows Debtors' medical expenses of $1,100 per month.

### D. Charitable Contributions

On Debtors' July Schedule J, Debtors listed monthly charitable contributions of $400.00. However, Debtors' 2012 tax return shows annual charitable giving of $1,750.00, or roughly $150 per month. Trustee noted this discrepancy and Debtors have altered their monthly charitable giving to $150.00 per month in the October Schedule J. The court allows Debtors' charitable giving of $150 per month.

### E. Other Expenses

The court notes that there are additional expense categories in Debtors' October Schedules which have not been discussed within this opinion. Trustee has not challenged these expenses. Additionally, these expenses have not undergone large changes between the July Schedules and the October Schedules, unlike Debtors' medical expenses. Therefore, the court notes that each appears reasonable.

## III. Conclusion

Based on the discussion above, Debtors' monthly net income is $6,385.48. The court allows Debtors monthly expenses of $5,347.36, which includes the reduction of $123.79 per

12

month from Communications Utilities. After subtracting Debtors' monthly expenses from their monthly income, Debtors have $1,038.12 in excess monthly funds. Therefore, Debtors' monthly plan payments are increased from $250.00 to $1,038.12, an increase of $788.12. Additionally, Debtors' future tax refunds, if any, should be paid to Trustee. An order will be entered simultaneously with this opinion.

It is so ordered.

# # #

**Service List**:

**Joe Martin**
6468 Edie Hill Rd SE
Uhrichsville, OH 44683

**Betty Jo Martin**
6468 Edie Hill Rd SE
Uhrichsville, OH 44683

**Nicole L. Rohr**
Thrush & Rohr LLC
4410 22nd Street NW
Canton, OH 44708

**Toby L Rosen**
Toby L Rosen, Trustee
400 W Tuscarawas St
Charter One Bank Bldg, 4th Floor
Canton, OH 44702